UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

_____

UNITED STATES OF AMERICA,             )
                                      )
                    Plaintiff,        )     Case No. 19-CR-67
                                      )
        v.                            )     Green Bay, WI
                                      )
XENGXAI YANG,                         )     February 4, 2021
                                      )     1:30 p.m.
                    Defendant.        )
_____

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:          United States Dept. of Justice
                                   (ED-WI)
                                   By:  MR. ANDREW J. MAIER
                                   Office of the US Attorney
                                   205 Doty Street, Ste. 301
                                   Green Bay, WI  54301
                                   Ph:  920-884-1066
                                   andrew.maier@usdoj.gov

For the Defendant
XENGXAI YANG:                      Federal Defender Services of
                                   Wisconsin
                                   By:  MR. THOMAS E. PHILLIP
                                   801 E. Walnut Street, 2nd Fl.
                                   54301
                                   Ph:  920-430-9900
                                   Tom_Phillip@fd.org

U.S. Official Transcriber:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by electronic recording, transcript
produced by computer-aided transcription.

1       TRANSCRIPT OF PROCEEDINGS

2       (Transcribed from audio recording.)

3       THE CLERK:  Court is again in session.  The Court

4   calls Case No. 19-CR-67, United States of America versus

5   Xengxai Yang, for sentencing.  May I have the appearances,

6   please.

7       MR. MAIER:  Andrew Maier for the United States.  Good

8   afternoon, your Honor.

9       THE COURT:  Good afternoon.

10      MR. PHILLIP:  Good afternoon, your Honor.  Tom Phillip

11  appears.  Mr. Yang appears by video from the Brown County Jail.

12  Before we go any further, I will inform the Court that both Mr.

13  Yang and I agree that this hearing can be held by video means.

14  I believe that the Court has authority to hold the hearing by

15  video under three different ways, first under the CARES Act,

16  second under Judge Pepper's general orders making findings

17  under the CARES Act.

18      Mr. Yang, if you could briefly mute your microphone.

19      THE DEFENDANT:  Sure.

20      MR. PHILLIP:  Thank you.

21      And then the Court can make specific findings for this

22  case, I believe, under several reasons.  First, Mr. Yang

23  affirmatively wants to proceed today by video.  He does not

24  wish to delay the case any further.  He's been in the Brown

25  County Jail for about 22 months.  And so there's no programming

1    really at the Brown County Jail, so he's anxious to move along

2    to the next step in the prison system.  I believe that waiting

3    for an unknown date when in-person hearings could again be held

4    would not be in his interest.

5        Also, based on both the number of victims and, also, the

6    number of family members that would want to attend an in-person

7    hearing, I think that with those numbers an in-person hearing

8    would likely present a danger to public health.  So rather,

9    this type format allows, I would say, more people to

10   participate.  And indeed there's many people who have either

11   dialed in or have video connections to attend today's hearing

12   virtually.

13       So I think all of those reasons would give the Court enough

14   to make specific findings and general findings allowing today's

15   sentencing be held by video.

16           THE COURT:  Thank you, Mr. Phillip.

17           MR. KOEHLER:  Good afternoon, your Honor.  Brian

18   Koehler on behalf of the US Probation Office.

19           THE COURT:  Okay.  Well, first off, I will make the

20   findings required under the CARES Act to allow us to proceed by

21   videoconferencing.  I am satisfied from the statements made by

22   Mr. Phillip that there -- that I can reasonably find and I do

23   find that the interests of justice would be seriously impaired

24   by further delay in these proceedings.

25           Certainly, the fact that Mr. Yang has been in custody for

1    22 months, almost two years, without programming is an

2    important consideration.  I think also the fact that the case

3    is that old, that it has been -- that it has, as a result of

4    change of counsel and then the withdrawal of the plea or the

5    addition of the not guilty plea and the need for examinations,

6    have delayed the case.  And delay of this nature serious

7    impacts not only the defendant, but certainly the victims, who

8    I can tell from the victim impact statements have found it

9    difficult to move on as this case continues to be pending.

10        So those reasons, as well as all of those given by Mr.

11   Phillip, certainly support my finding that the interests of

12   justice would be seriously impaired by further and indefinite

13   delay.  And I -- the chief judge's findings are of record, so I

14   don't need to address that.  And I accept Mr. Phillip's

15   statement that he has consulted with his client and his client

16   then consents to proceed in this fashion.  So those are the

17   required findings, so we can proceed.

18        So this is a sentencing hearing.  Mr. Yang has been found

19   guilty of armed bank robbery in violation of 18 USC Section

20   2113.  That carries up to 25 years imprisonment and a $250,000

21   fine.  Count 2 brandishing a firearm during a crime of violence

22   carries a mandatory minimum 10 years, a maximum of life

23   imprisonment, and again a $250,000 fine.  That's a violation of

24   18 USC Section 924(c).  And then Count 3 is unlawful possession

25   of a firearm.  This is a violation of 26 USC Section 5841, and

1    that carries a maximum term of 10 years in prison and a $10,000

2    fine.  So those are the charges before us that require a

3    determination on sentencing.

4        Mr. Maier, have you reviewed the presentence report?

5            MR. MAIER:  I have, your Honor.

6            THE COURT:  Are there any objections to the factual

7    statements in the presentence report?

8            MR. MAIER:  No, your Honor.

9            THE COURT:  And are you in agreement with the

10   recommended guideline calculation?

11           MR. MAIER:  I am.

12           THE COURT:  And, Mr. Phillip, I take it you've gone

13   over the presentence report with your client; is that correct?

14           MR. PHILLIP:  Yes, your Honor.

15           THE COURT:  Are there any objections to the factual

16   statements in the presentence report?

17           MR. PHILLIP:  No, there are not.  And we also agree

18   that the guidelines are correctly calculated in the reports,

19   and we accept those as well.  We made some informal corrections

20   to the presentence report that are addressed in the final

21   version, and so we'd agree that the Court can accept the

22   report.

23           THE COURT:  Okay.  So I will adopt, then, the factual

24   statements in the presentence report as my findings of fact.

25   I'll also adopt the recommended guideline calculation.  The

1    offense level is 24, the criminal history category is I.  So

2    the guideline range on Count 1 is 51 to 63 months.  Count 2

3    carries a 10-year mandatory minimum, so that would be a 120

4    month guideline.  And then Count 3 is -- I don't know, do we

5    have a guideline range on Count 3?  Or I guess the -- it's

6    contained in the initial guideline I mentioned.  It's a

7    grouping of the offenses.

8            MR. PHILLIP:  Yes.

9            THE COURT:  Just one moment.  I need to address

10   something.  Just one moment.

11       Okay.  Very well.  So that's the starting point in the

12   sentencing determination.  I've certainly read the presentence.

13   I've read the defense memorandum -- sentencing memorandum and

14   the letters, and the victim impact statements, letters from

15   family and friends of Mr. Yang, and then the victim impact

16   statements that have been submitted by the credit union

17   personnel.

18       Is there any evidence or other statements or

19   supplementation of those being offered today, Mr. Maier?

20           MR. MAIER:  Your Honor, I do know that Kathy Cruz, who

21   is -- she did submit a victim impact statement, but she is --

22   was the assistant branch manager.  I think she may still be.

23   She wanted to address the Court as well.  And I know that the

24   three victims are at the credit union and on video today.

25           THE COURT:  Okay.  And, Ms. Cruz, if you wish to make

1    a statement, this would be a good time to do so.  Just state

2    your full name, and then you can -- you can make your

3    statement.

4         MS. CRUZ:  Thank you.  My name is Katherine Cruz.  I

5    am the branch manager at the location that was robbed.

6        Okay.  I absolutely love what I do for a living.  I love

7    helping our members.  I love assisting them in anything

8    financial that they need help with.  In a financial cooperative

9    built on the principles of people helping people, I and my team

10   are focused on servicing members, being part of solutions, and

11   making a difference.  At 5:51 p.m. on March 15th, 2019, my

12   world changed when the robber came into my -- came into our

13   office screaming and pointing a sawed off loaded rifle at my

14   team and I.

15       My first thought was, "How do I protect them?"  That is all

16   I could think of.  "How do I protect my team?"  The thought of

17   losing any one of them was unbearable, yet that was the

18   situation I suddenly found myself in, the possibility of life

19   or death.  I'm their manager, and all I could do was watch this

20   nightmare unfold right in front of us.  I was terrified.  I

21   didn't know what to do.  I didn't know what he was going to do.

22   Was he going to rob us?  Was he going to shoot us?  I could

23   hear the ammunition rolling around in his pockets every time he

24   moved.  I can still hear it to this day.  It magnified the

25   unknown, and the unknown was horrible.

1      I did as I was trained, burning images into my mind with

2 the hope of being able to recount them with the police.  At

3 first, looking at his shoes was the first thing that came to

4 mind.  For the first few moments, I focused on his boots.  Then

5 I started looking at other things, like hair color, color of

6 skin, searching for possible tattoos, rings, or piercings that

7 would help identify him.  I believe that he noticed me doing

8 that.  He told me to turn around, then zip tied my hands behind

9 my back and did the same to Courtney.

10      I had a moment of relief when I noticed a police officer

11 drive around the building.  But in the meantime, terror and

12 uncertainty ruled.  He seemed so unhinged.  What was he going

13 to do to us?  Finally, after restraining Courtney, he left.

14 And we knew that we were physically all right.  We were quickly

15 surrounded by support from our credit union team, law

16 enforcement, and trauma counselors.  But I was changed.  And I

17 realized that I don't think I will ever be again who I was

18 before the robbery.

19      So many things have changed.  At first, I would try and put

20 on a brave face and help Courtney and Alice cope with the

21 aftermath of our experience.  I tried to be the one that they

22 knew that they could come to.  I thought I was doing all right.

23 It wasn't until my husband and I were driving home one

24 afternoon, and I saw an individual with a black hoodie, black

25 cargo pants on, and black boots.  I started panicking in the

1    car as the memory of the robbery came rushing back.  I have

2    never seen the look on my husband's face when I started

3    panicking.  He got us out of there real quick.  But what the

4    robber took from me was my sense of security.

5        I look over my shoulder all the time.  We've put a video

6    doorbell and motion lights on the house.  I carry protection

7    with me wherever I'm legally allowed.  And even before the

8    pandemic hit, I would rarely go out anymore.  Going to public

9    places is a struggle for me, never knowing who could emerge

10   from the crowd.  Who knew that going to buy a gallon of milk

11   would be such an issue.

12       I used to do a lot of volunteer work, and now I will only

13   help if I can do it over the phone or by computer.  There are

14   extremely few people that I trust now.  And even today, they

15   help keep me grounded when I need it.

16       The robber was unfair.  He had no right to do what he do to

17   us.  It wasn't just about the money.  It wasn't just a

18   victimless crime.  He stole my security.  In a matter of

19   minutes, he instilled fear and anxiety in me that impacts me

20   every day.  Because of him, last month one of our neighbors was

21   trying to play a joke on me and ducked down beside my car then

22   jumped up on the driver's side screaming and pounding on the

23   window.  Before the robbery, I would have found that funny.

24   Now I was hysterically sobbing in seconds.  Even though I

25   thought I was making progress and things were getting better,

1    it all came rushing back.  When my friend was screaming, all I

2    saw was the robber's face.

3         I'm back in counseling again.  I've talked to my manager

4    about possibly finding me another position within the credit

5    union, which hopefully I won't have to do.  But I can't let the

6    robber control me, but it's difficult.  Some days I have to

7    take things one step at a time, especially with our members

8    coming in with masks on.  I am an extremely determined

9    individual, and I can't let what he did to us derail my career

10   that I have worked so hard for because of his selfishness and

11   thoughtlessness in bringing violence and fear into our lives.

12        I am respectfully asking the Court to reprimand him to a

13   federal facility for 20 years for the following reasons:  It

14   will give each of us, Courtney, Alice and I, time to heal and

15   time to move on with our lives.  In 20 years, Alice and I will

16   both be retired.  And my husband and I have plans to move out

17   of the area afterwards.  I'm hopeful that Courtney will have

18   graduated in her field of study and moved on to the next

19   chapter of her life.

20        The robber not only took my security away, but he has made

21   me second-guess most of my decisions.  Everything is now based

22   on whether or not I'll be safe.  Knowing he is incarcerated for

23   20 years can help give me that security and peace of mind.

24   When the robber is released and if his mom is still living in

25   the same location that she is right now, he will only be living

1    blocks from the branch.  20 years can make that less of a

2    possibility and less of an opportunity to once again "try

3    something new" that will hurt others in trying to get even.

4        The robber has made a mockery out of the court system with

5    inconsistent claims of incompetency, changing stories, and

6    attempts to save himself without any consideration for the

7    victims of his crime.  He has not shown any remorse or extended

8    an apology.  A sentence of 20 years will provide plenty of time

9    for reflection.

10       Before all this happened, Courtney and Alice were my team

11   members.  Now they are my family.  I know that all three of us

12   will support each other, but I also know all too well the

13   struggles that each of us are facing in the aftermath of this

14   trauma.  To this day, I'm still wondering what I could have

15   done to make this less traumatic for them.  Requesting a

16   sentence of 20 years is one thing I can do.  Thank you.

17            THE COURT:  All right.  Thank you, Ms. Cruz.

18       Mr. Maier then.

19            MR. MAIER:  Thank you, your Honor.  I want to

20   reference briefly the other two victim impact statements.  We

21   had the other two victims each recommending 15 years in prison.

22   They all -- they all really described a similar experience to

23   what Ms. Cruz just did in relaying her victim impact statement

24   to the Court.  This is not something that happens in a vacuum,

25   this crime.  And, you know, she's right, they didn't deserve to

1   have this happen to them.

2       This isn't something -- nobody's saying this, of course,

3   but sometimes you hear things callously in the community like,

4   "People that work at a bank or gas station should be prepared

5   to be robbed," you know, "They receive training," and that sort

6   of thing.  But they don't deserve to have a gun pointed at them

7   and be zip tied and treated -- treated this way by someone who

8   was member in the credit union.

9       They certainly indicate in the victim impact statements the

10  trauma that this caused which will be long-lasting.  The

11  Government's view is that that's relevant to the seriousness of

12  the offense.  It's relevant to the need for public protection

13  in this case as well.  What I'm asking you to do is impose a

14  sentence at the top end of the guideline, so 183 months.  The

15  -- the reason for this is there -- there's a few reasons.  And

16  the first is that we have enhancements within the guidelines

17  calculation for things like taking -- actually taking money

18  during a bank robbery and for restraining employees in order to

19  conceal the crime.

20      One of things that we don't have, which I think is a factor

21  here, is the disguising of the appearance.  It's not a

22  guidelines enhancement.  It certainly fits into the seriousness

23  of the offense.  But I think you can see from -- I can't recall

24  which victim impact statement talked about it, but going to a

25  concert.  And it's probably not a kind of music the Court would

1    listen to, but to see performers come out wearing masks similar

2    to that worn during the robbery ruined that experience for her.

3         You know, there's things that will trigger them even with

4    therapy, even with counseling, even with some time, that will

5    make them think about this robbery.  Seeing someone walk down

6    the street in a not uncommon outfit, dark pants, dark hoodie or

7    jacket.  That's a lot of Wisconsinites a lot of the year.  You

8    can hear the -- so that it's -- you can hear that this crime

9    had a tremendous negative impact on the victims.

10        We also I think in looking at the need to balance that

11   punishment and deterrent purpose of the sentencing, we don't

12   necessarily have a situation in the Government's view where we

13   can assume that rehabilitation is possible or even really

14   desirable.  This is a defendant who has never explained why he

15   did this, except to say he wanted to try something new.  He has

16   never openly expressed any remorse.  I supposed today is his

17   day.  He's never said anything about the impact of the offense

18   on the victims.

19        When he was interviewed right after -- I know the Court

20   watched the interview; it was part of the bench trial in this

21   case -- he more or less didn't have any feelings at all for the

22   people that he had done this to and really didn't have any

23   feelings at all about any of it.

24        As it relates to the treatment needs or the rehabilitative

25   needs, we have -- we had two experts provide reports to the

1    Court on the issue of insanity who had concerns about him

2    malingering as to lack of memory.  He claimed an inability to

3    recall anything when the PSR writer first interviewed him about

4    a year ago.  This contrasts pretty sharply with the law

5    enforcement interview where he provided information about what

6    he had done.

7        He's claimed influence of auditory hallucinations, but

8    didn't demonstrate any of the typical signs of experiencing

9    that when Dr. Johnson interviewed him.  So I think we have

10   someone who's really a risk and needs to be incarcerated for

11   the longest reasonable amount of time possible.  I think in

12   this case that -- that number is at the top end of the

13   guidelines.  It's 15 years and three months.

14       And I think you can -- you can give a lot of -- a lot of

15   comfort to these three women.  And I know that that's not the

16   purpose of sentencing, your Honor.  But the -- the victim

17   impact statement written I believe it was by Courtney talked at

18   the very last page of the PSR as filed electronically, she

19   would have graduated college, she can have a bachelor's degree

20   and a master's degree, be working in her dream career, be a

21   lifetime away from this.  And Kathy can be with her husband

22   somewhere else retired and, you know, experiencing the

23   happiness of the end of a career and a relaxed life knowing

24   that until then Mr. Yang is locked up and won't do this to them

25   or anyone else.

1    So I think the appropriate sentence is 183 months, and

2    that's what I'm asking on behalf of the Government for you to

3    impose today.  Thank you.

4         THE COURT:  All right.  Thank you, Mr. Maier.

5    Mr. Phillip?

6         MR. PHILLIP:  Thank you.  The Court here has a great

7    deal of information based on the presentence report, the

8    psychological examinations, and then, of course, presiding over

9    the trial at which the experts testified.  And with all of

10   that, the Court certainly has enough information about the

11   nature and circumstances of the offense and the history and

12   characteristics of the defendant.

13        I want to go backwards a moment, and I've already said it

14   -- the Court has, too -- I want to talk briefly about the fact

15   that this case took a long time.  The events were from March

16   15th of 2019, so that's about 22 months ago, give or take.  And

17   the case was delayed at first so Mr. Yang could be examined by

18   Dr. Berney.  There was a change of counsel in there.  There was

19   a second exam by Dr. Johnson.

20        And during that time when I came onto the case and retained

21   Dr. Johnson, we had a great difficulty caused by the pandemic,

22   and that caused longer delay.  And then finally, I won't

23   characterize this as delay, but the case was litigated quite a

24   bit back and forth, and that took time as well.

25        Now, none of that, in my opinion, was any delay for delay's

1    sake or from inattention.  This case was complicated, not so

2    much factually.  The case, as the Court was aware from the

3    materials submitted at trial, was -- took place all in really a

4    very short time back on March 15th, 2019.  Mr. Yang was

5    arrested moments after leaving the credit union, right -- maybe

6    a block or so away.  So the facts aren't so complicated, but

7    the issues presented in the case are.  And none of those issues

8    have been frivolous.

9        The not guilty by reason of mental disease or defect plea,

10   for example, is not something that's frivolous.  It's something

11   really that seldom happens.  For me in my career in this Court,

12   in federal court, I may have brought that up maybe three times

13   in 18 years.  In my entire career, maybe five times in 25

14   years.  So that's not something that comes up without a basis.

15   I treat my work for my clients very, very seriously.  I have a

16   duty to the Court, and I have a duty to myself to only bring

17   issues that I believe have a basis.

18       So Mr. Yang was examined by two separate psychologists.

19   Really between the two them combined, they had over 70 years of

20   experience in their fields.  And though they differed in their

21   final conclusion, both found Mr. Yang to have similar diagnoses

22   going back to age nine.  And with those reports, we have an

23   adversary system of justice, so Mr. Maier and I have different

24   functions.  And we both worked, as we should, as professionally

25   and capably as we could to fulfill our functions.  And then the

1    Court made rulings throughout the case on issues as they were

2    presented.  So this took a long time to do.  Some of it was

3    through litigation.  Some of it was delay caused by the

4    pandemic that no one could have predicted.

5         But none of the delay or none of the issues brought up in

6    this case were any attempt to manipulate the process.

7    Certainly the Court wouldn't have allowed any attempt to

8    manipulate the process.  The criminal justice system that we

9    have isn't designed to achieve speed.  It isn't just designed

10   to achieve punishment.  The goal is to achieve a just result,

11   and sometimes that result takes a lot of effort and a lot of

12   time.

13        So now having gone through that, now we're at the point

14   where the Court does impose the sentence.  And so as the

15   parties are obviously familiar, the Court looks at the nature

16   and circumstances of the offense, the history and

17   characteristics of the defendant, and the Court tries to

18   accomplish the policy goals from the statute of respect for the

19   law, deterrence, protection of the public, provision of

20   treatment, and just punishment.  So the goal is to come to a

21   sentence that is sufficient but not greater than necessary to

22   encompass those goals.

23        So the guidelines and the statute together suggest a

24   sentence of approximately 14 to 15 years.  Ten years of that

25   comes from the brandishing charge, Count 2.  And I have no

1    argument against that.  Using a firearm during a crime of

2    violence, as this is, significantly increases the danger of the

3    facts of the case, significantly increases the seriousness of

4    the facts of the case.  So obviously the imposition of that

5    10-year mandatory minimum portion of the sentence provides

6    respect for the law, because that comes directly from a mandate

7    of Congress that must be followed.  And the term realistically

8    is likely to be longer than that 10 years.  Again, the

9    guidelines suggest four to five years.  And adding 10 years,

10   that's where we get to the 14 to 15 years.  And as I wrote in

11   my memorandum, that is the correct guideline and analysis.

12       But the practical, factual real world part of the case is

13   that this isn't separate events.  It's all one event.  The

14   10-year part is legally distinct, but it leads to one total

15   sentence for one event.  So I would argue that the Court can

16   still encompass all of the statutory policies with a slightly

17   lower sentence, perhaps 12 or 13 years, rather than the 14 or

18   15 suggested by the guidelines.

19       Obviously, any sentence that the Court is going to impose,

20   whatever it is, is going to punish Mr. Yang.  That punishment

21   has already started.  He's been in custody for just under two

22   years already.  And it's not likely that he would be released

23   under any realistic sentence until after the turn of the next

24   decade.  So any term longer than 10 years is significant

25   punishment.  That punishment, that term behind bars, of course,

1    protects the public because Mr. Yang is incapacitated.  He's

2    behind bars.

3        This case, because of the charges at issue, has five years

4    of supervised release available.  That's more than the three

5    years that come with most federal statutes.  And federal

6    supervision, as the Court and parties already know, is

7    thorough.  And it really provides meaningful support for the

8    defendant.  It also provides very meaningful protection of the

9    public.  There is always a possibility that if Mr. Yang engages

10   in any other kind of criminal activity in the future, not just

11   this kind of criminal activity, that he can go back into

12   custody.  That's a practical deterrent for the future.

13       Overall, the total sentence both prison and supervised

14   release is going to provide adequate deterrence that the

15   statute requires.  General deterrence is always, in my opinion,

16   somewhat unknown, but it is still likely to occur in this case

17   based on the sheer number that the Court is going to impose,

18   the sheer number of years the Court's going to impose.

19       Specific deterrence, as I frequently argue, is much more

20   concrete.  And so obviously Mr. Yang is going to be deterred.

21   The initial deterrence comes from the sentence itself, prison

22   sentence itself.  And then as I already said, the practical

23   deterrent later of supervised release.  So deterrence lasts

24   beyond the actual number of years into the community when he's

25   eventually released.

1      I want to end by just briefly talking about Mr. Yang's

2    history and the future.  I almost never end a sentencing

3    argument with the defendant's history.  That's usually a place

4    where I begin.  But here, as I'm -- as I was preparing for

5    today's sentencing, I continually reminded myself that Mr. Yang

6    just turned 21 and that he really doesn't have that much

7    history.  His history is really going to be made in the future.

8      I'll refer to one of the victim's statements that suggested

9    a 15-year term would be -- would be what she requested.  And I

10   was taken by a phrase that the victim used there.  She

11   graciously said that Mr. Yang would still be young when he was

12   released, that he could still have a life.  And that's true.  I

13   think that's correct.  I think that's perceptive.

14     Mr. Yang can get treatment while he's in custody.  I would

15   gently disagree with the Government where Mr. Maier -- I want

16   to get the words right -- that he couldn't assume that

17   rehabilitation is desirable for Mr. Yang.  I'd gently disagree

18   with that, because I always think rehabilitation is desirable.

19   Prison system is not designed for rehabilitation.  It's a

20   probably secondary or tertiary concern in the prison system.

21   Their main concern is punishment and security.  I don't

22   disagree with that.

23     Rehabilitation is hard to mandate upon someone.

24   Rehabilitation comes when someone wants to change their life on

25   their own and takes advantage then of opportunities that are

1    offered.  While there will be treatment and there will be some

2    rehabilitation in custody during the sentence, during that

3    sentence, the community will be protected.  The victims will

4    have peace of mind.  I think they should also have peace of

5    mind by the term of supervision.

6        But again, eventually Mr. Yang will be released.  And

7    another thing I was struck by in preparing for today, was by

8    Mr. Yang's family support.  All of the letters that I filed

9    said the same thing, that the family members, whether they are

10   brothers and sisters or cousins or other extended family, they

11   all said that they would be there for him when he got out.  And

12   so that's my nod to the future, that after he is imprisoned,

13   Mr. Yang will get support from his family and from the

14   probation office to give him that opportunity to never come

15   back, because that's what we all want.

16       None of us want Mr. Yang to come back for any reason

17   whatsoever.  I certainly don't.  The Court certainly doesn't.

18   Mr. Maier certainly doesn't.  The victims certainly don't.  And

19   so I think that a sentence slightly less than the guideline

20   range still accomplishes all of the goals of sentencing.  It

21   punishes, it protects, it deters.  And during the term of

22   supervision, it gives Mr. Yang some opportunity to make

23   something of himself that he hasn't yet.

24       So to summarize, I'd ask that the Court impose a sentence

25   below the guideline range.  I'd ask that the Court impose the

1    five years of supervision.  Mr. Yang has no ability to pay a

2    fine, so I'd ask the Court to decline imposing one.  No

3    restitution has been requested.  I'd ask that the judgment

4    reflect two recommendations, one for mental health treatment,

5    and two for placement as close to home as possible.

6        I'd ask that the Court -- after imposing sentence that the

7    Court read the conditions of supervision out loud.  I've gone

8    through them with Mr. Yang, and they're also in the presentence

9    report.  But I'd ask that the Court read them today.  Finally

10   then, your Honor, Mr. Yang has prepared a short statement that

11   he would read to the Court at this point.

12       Mr. --

13           THE COURT:  Thank you, Mr. Phillips.

14           MR. PHILLIP:  Mr. Yang --

15           THE COURT:  Mr. Yang --

16           MR. PHILLIP:  Sorry, your Honor.

17       If you can unmute your microphone, you can address the

18   Court.

19           THE COURT:  Okay.  Mr. Yang, if you have anything to

20   say, now is your opportunity.

21           THE DEFENDANT:  Yes, your Honor.  I want to say how

22   sorry I am for what I've done to the hard-working employees of

23   the bank.  I truly apologize for my wrongful acts, and I

24   understand there will be anger and shame towards me.  I have

25   affected countless lives and families, including my own.  And I

1    know there is nothing I can say or do to change that.

2        Since my incarceration, I have gone through the saddest

3    moments in my life.  I lost my fiancée, including my son.  And

4    I'm about to lose so much time that I can never get back.  But

5    the saddest one of them all was may father passing away.  It

6    hurt so much because I was not able to see him one last time in

7    person.  I cannot risk going through that again.

8        During my incarceration, I plan on furthering my education.

9    I will also be participating in treatment programs that will

10   help me rehabilitate and prepare me to become a positive

11   functioning member in society upon my release.

12       I am now a father, and there are duties and responsibil-

13   ities waiting for me when I get out.  So I will use this time

14   wisely to better my life for myself and my family.  Thank you.

15            THE COURT:  All right.  Thank you, Mr. Yang.  We're

16   getting a lot of feedback -- yeah, that would help.  Thank you.

17       Well, in fashioning a sentence, I'm required to begin with

18   the guideline range.  And here the guideline total is in the

19   neighborhood of 14 and a half to over 15 years, in that

20   neighborhood.  That's a starting point, but it's not a

21   presumptive sentence.  The Court is required to consider the

22   nature and circumstances of the offense and the history and

23   character of the defendant and then fashion a sentence which

24   meets certain goals, the first of which is to impose just

25   punishment for the offense.  And just punishment, of course, is

1    punishment that reflects the seriousness of the offense and

2    promotes respect for the law.

3        But other purposes of sentencing is deterrence.

4    Deterrence, of course, is the message-sending function of the

5    sentence.  It tells both the defendant and others who might be

6    tempted to engage in such conduct that this crime does not pay.

7    The costs of committing it are so steep that you will not want

8    to do this.  And, of course, the more serious the offense, the

9    more strong that message needs to be sent strongly.  Another

10   purpose of sentence is to protect the public from further

11   crimes of the defendant and then lastly and but also important

12   is, of course, rehabilitation of the defendant.

13       So turning first to the nature and circumstances of the

14   offense, you know, there's no dispute, a robbery, the taking of

15   property by use of force, is a serious offense.  To arm oneself

16   with firearms, to restrain using these ties, plastic ties, the

17   innocent, you know, tellers at the bank and the manager, this

18   is a -- this is a very serious offense.  No civilized society

19   can tolerate a masked person going into a credit union or a

20   financial institution armed with a loaded gun and then pointing

21   it at people and then demanding money and walking out.  So

22   we're obviously talking about a -- an extremely serious

23   offense.

24       And I -- Mr. Maier is correct that the impact upon the

25   victims is certainly one of the factors I take into

1    consideration in assessing the seriousness of the offense.  As

2    I said before, in many types of cases if there was a sentence I

3    could impose that would undo that trauma, that would take away

4    that loss, that feeling of insecurity, I certainly would do it.

5    But that's not something within this Court's ability.  I can

6    impose a just sentence, and that requires that I certainly

7    consider the impact on the victims and the seriousness of the

8    offense.  But I'm also required to consider those other factors

9    relating to the defendant, namely his history and character and

10   then that need for the sentence ultimately to meet all those

11   other goals.

12        In turning to another factor, it's worth mentioning because

13   I think Mr. Phillip spent a good deal of time talking about the

14   history of the case, and there is a concern that the -- this

15   idea that the Court has been manipulated or there's been an

16   effort to play games here.  And I made specific findings at the

17   conclusion of the trial on the issue of mental disease or

18   defect where I think I unequivocally rejected the argument or

19   the defense that the defendant was mentally ill.

20        But I didn't find it frivolous, and I think it's important

21   to note how bizarre this crime was and is.  This is a person

22   without any prior record, who walked into a credit union masked

23   and commits this crime and then walks out in broad daylight

24   still donning his mask, is immediately apprehended as he's on

25   the sidewalk, and essentially caught red-handed.  And we have a

1    lengthy interview with the detective trying to figure out why

2    he did these things.

3         It was -- because it was so out of character and because it

4    didn't -- the manner in which it was committed was so bizarre,

5    and by that I mean there wasn't a getaway car, it was his own

6    credit union, he asked for a withdrawal -- I mean, there was

7    lot of strange things about this that raised questions as to

8    what kind of state of mind, what -- what was going on in this

9    defendant.

10        And I'll -- I think I should emphasize that a basic

11   principle of our legal system is that we do not punish people

12   for conduct that's the result of severe mental illness or

13   illness that robs them of their freedom and is the cause of

14   that type of crime.  Now, rarely would a robbery be seen in

15   that type of situation.  But nevertheless, that issue arose.

16        We did have the defendant examined, and the original

17   psychiatrist -- psychologist issued a report that was -- it was

18   not a clear rejection of the defense.  It was essentially it

19   wasn't strong enough or the evidence wasn't strong enough.  And

20   so Mr. Phillip, when he took over this case, naturally looked

21   at that and concluded that a follow-up evaluation might give

22   him a better idea.  And I think Mr. Phillip's point about he

23   does not take these things -- or he takes these things

24   seriously and does not lightly interpose such a defense, that's

25   my -- he's been practicing in front of me for a long time.  I

1    certainly did not think it was frivolous to raise the defense

2    given the original psychological evaluation, the one he

3    received from Dr. Johnson, and of course the bizarre nature of

4    the offense itself, and the seemingly-out-of-character

5    behavior.

6         So I say that not as a defense of the conduct of the

7    defendant, but to try to help people understand how our system

8    works and why it may seem that it was manipulated or that there

9    were things being done that didn't make sense.  And yet it was

10   an appropriate response to the evidence that was apparent in

11   this case.

12        Now, having listened to the psychologist, having reviewed

13   the initial interview, I of course rejected.  And frankly there

14   was evidence of -- that the defendant was manipulating, that he

15   -- and I -- my sense is that there was this loss of

16   recollection of the things and the -- absent of a history of a

17   severe mental illness led me to conclude that that defense

18   wasn't viable.

19        On the other hand, I'm still left with a very bizarre

20   crime.  And as I explained at the time, the explanation given

21   is not -- it's not a very reasonable one.  It's a bizarre one.

22   It's the one one would maybe expect out of a very immature

23   person who doesn't really appreciate the magnitude of what he

24   was doing, not because of a mental illness, but because of

25   perhaps a lack of maturity or a blindness to the impact upon

1   other people.

2       Again, I -- I look at these -- the family support.  And I'm

3   looking at the letter of Jensen Yang, one of the defendant's

4   brothers.  He describes him, he says, "Xengxai has grown into

5   other people's lives where his kindness and joy resonates

6   indefinitely.  We remember XengXai as the funny little brother

7   who always puts a smile on our faces and reminds us that even

8   the smallest things can make our worst days a little better.  I

9   admired XengXai's motivation for always striving for greatness.

10      "He's always so eager to learn, and I've seen firsthand

11  from how far he has come.  From learning to fix cars on his

12  own, doing projects around the house, or even learning how to

13  engineer his own mini-projects.  I'm amazed on how determined

14  he was, and I believe he can become something great.  I'm

15  faithful that we'll be able to give XengXai an opportunity to

16  let him find his true caring character or to leave behind those

17  negative traits which don't belong him.  Your Honor, thank you

18  very much."  Okay.

19      The point I'm trying to make is this reminds me of the

20  defendant's description of himself to the detective who

21  interviewed him.  He said he was bored.  He had learned

22  everything.  This is hardly the behavior or conduct or

23  description of a person with a severe mental illness that drove

24  him to commit a crime that he otherwise wouldn't have

25  committed.  And I'm struck by how, again, the -- the lack of

1    appreciation of the magnitude of the crime that he was

2    committing, the impact upon the victims of the offense and the

3    consequences.

4        That doesn't reduce the magnitude of the crime, but it does

5    tell me something about the defendant, as well as the fact he

6    doesn't have a prior record.  I mean, this is not a person who

7    was in trouble all the time.  There's no juvenile record.  I've

8    been doing this a long time, and typically dangerous people

9    aren't suddenly dangerous and then not dangerous.  There's a

10   behavior we look at that we see coming along.  And that's not

11   to say you can have, you know, crazed things happen all the

12   time.  That's unfortunately one of the things that makes life

13   itself a risk, you know, to -- placing this person in prison

14   for 20 years, this is one person.  There are a lot of people

15   out there, and I'm not -- luckily the vast majority of people

16   are decent or at least decent enough to commit such a horrible

17   crime.

18       But I look at the defendant, and there -- this is in one

19   sense a very bizarre period or event in his life.  And yet it

20   was done consciously.  It was done for no real decent reason.

21   It was done out of boredom, and the impact is huge.  And he

22   will suffer a significant penalty, and much of it is beyond my

23   control.

24       But I -- those are the factors that I take into

25   consideration, not only the magnitude of the offense itself,

1    but I look at the immaturity of the defendant, the

2    youthfulness, the absence of a prior record.  And I ask myself

3    what sentence is necessary in order to, one, impose just

4    punishment, two, to deter others, three, to protect the public,

5    and, four, to provide opportunities for rehabilitation.  And

6    considering all of those factors, I'm satisfied that it's very

7    close to the guideline.

8         I'm going to impose a sentence of 48 months on Counts 1 and

9    3.  That's four years.  That's consecutive to the 120 months,

10   the 10 years, on Count 2.  And I'm going a little bit under,

11   not much, because of the factors that I've elicited or talked

12   about concerning the immaturity and the bizarre nature of the

13   crime, the -- my sense that the defendant had lack of

14   appreciation.

15        I note -- I certainly agree rehabilitation is always

16   something we look at and is certainly possible in every case.

17   That's the wonderful thing about being a human being, you can

18   change.  In fact, we all change.  We change year to year.

19   Frankly, we change week to week.  Fourteen years is a long time

20   for Mr. Yang, and he will change.  And I -- I think when I look

21   at his background and I look at his family, I look at the --

22   the history in the case, it seems to me that this is sufficient

23   but not greater than necessary to accomplish those important

24   goals.  Obviously, it's a tremendously lengthy period of time

25   for someone who's never been in jail before, never been in

1    trouble before.  Seldom does a person get a first sentence of

2    this magnitude in the absence of actually, you know, physically

3    injuring someone.  That's not to minimize the damage and the

4    injury and the effect on the victims in this case.  But it's to

5    recognize that this is not -- could have been something very

6    different.

7        It also, I'm satisfied, is sufficient to deter whoever

8    might be deterrable.  And I'm also satisfied with the five

9    years of supervision that I will add on top of that.  That's

10   five years on the -- on the count -- is it Count 2 that carries

11   the five years and then the other three are counts concurrent

12   with it for the total of five years of supervision.

13       I will impose the $100 special assessment on each count.  A

14   fine is waived.  He doesn't have the financial wherewithal,

15   ability to pay a fine.  The judgment will also include

16   recommendations for mental health.  I'm not denying there's a

17   mental health component here.  But as I read the family

18   description and as I see he's now gotten his high school

19   diploma out of the Brown County Jail, I am still convinced that

20   this is not -- this was not caused by a mental illness of the

21   kind of severity that would be needed to absolve him of

22   criminal responsibility.

23       I will also include in the judgment a recommendation that

24   the -- he be as close to his home as possible.  The federal

25   facility, the only one in Wisconsin is Oxford, but he may not

1    qualify.  And that's obviously up to the Bureau of Prisons.

2        The conditions of supervised release, then, will be as

3    follows.  And I take it from what you've said, Mr. Phillip,

4    that there's no objection to the recommended conditions in the

5    presentence report?

6            MR. PHILLIP:  Correct, your Honor.  We informally

7    resolved one objection I did have.  And so the conditions that

8    are in the report we do not object to them.  I believe that

9    they're reasonably related to the offense and the defendant.

10   But, again, I would ask that the Court read them out loud.

11           THE COURT:  Okay.  These are the mandatory conditions

12   of supervision.  The defendant shall not commit another

13   federal, state, or local crime.

14       He shall not illegally possess or use any controlled

15   substance.  I find there's a low risk of future substance abuse

16   by the defendant and, therefore, suspend the drug testing

17   requirements.  And it should be noted that there just isn't a

18   history of drug abuse here or alcohol abuse.

19       Conditions of supervision, additional conditions:  The

20   defendant is to report to his probation office in the district

21   to which he is released within 72 hours of his release from the

22   custody of the Bureau of Prisons.  And he's to report to the

23   probation officer in a manner and frequency as reasonably

24   directed by the Court or his probation officer.

25       Two, the defendant shall not leave the State of Wisconsin

1    without permission of the Court or his probation officer.

2         Three, he shall answer truthfully all inquiries put to him

3    by his probation officer subject to his Fifth Amendment right

4    against self-incrimination, and he's to follow the reasonable

5    instructions of his probation officer.

6         Four, he's to use his best efforts to support his

7    dependants.

8         Five, he's to use his bests efforts to find and hold lawful

9    employment, unless he's excused by his probation officer for

10   schooling, training, or other acceptable reasons such as child

11   care, elder care, et cetera.

12        The defendant shall notify his probation officer, this is

13   No. 6, at least 10 days prior to any change of his place of

14   residence or his place of employment.  If such prenotification

15   is not possible, he's to notify his agent within 72 hours after

16   the change.

17        Seven, the defendant shall not associate with any persons

18   known by him to be engaged in or planning to be engaged in

19   criminal activity.  "Associate" as used here means reside with

20   or regularly socialize with such person.

21        No. 8, the defendant shall permit a probation officer to

22   visit him at reasonable times at home and shall permit

23   confiscation of any contraband that's observed in plain view by

24   his probation officer.

25        No. 9, the defendant shall notify the probation officer

1    within 72 hours of being arrested or questioned by a law

2    enforcement officer.

3         No. 10, the defendant shall not enter into any agreement to

4    act as an informant or a special agent of a law enforcement

5    agency without the permission of the Court.

6         Eleven, the defendant shall have no contact with the victim

7    bank or credit union or its employees, including letters,

8    communication devices, audio or visual devices, visits, or any

9    contact through a third person without the prior written

10   consent of his probation officer and shall enter the premise --

11   not enter the premises or loiter within 1,000 feet of the

12   victim bank.

13        And the only reason a probation officer would give written

14   consent is for a letter of apology, and they would first

15   contact the victims before that would be allowed.  And that

16   would go through the -- through the probation agent.  Let me

17   indicate that.

18        The defendant shall participate in a mental health program

19   and shall take any and all prescribed medications as directed

20   by the treatment provider and participate in any psychological

21   or psychiatric evaluation and counseling as approved by his

22   supervising probation officer.  The defendant shall pay the

23   cost of this treatment under the guidance and supervision of

24   the probation officer.

25        I want to emphasize that this is a five-year term of

1    supervision that follows completion of the sentence. So he's

2    going to be either in prison or under the supervision of the

3    Court for a minimum of 19 years. If there's a violation while

4    he's on probation, the Court can not only -- and the violation

5    can be something like not reporting to his agent or using drugs

6    and alcohol, things like that. The Court can then either

7    revoke him and send him back to prison if the violation is

8    serious enough, or impose further restrictions like electronic

9    monitoring. The Court also has the ability to increase the

10   term of supervision and lengthen it so that additional time

11   might be on supervision.

12       I say that because to the extent that I've entered a

13   sentence below the guideline, the supervision I've added on

14   certainly will provide additional protection and safeguards.

15   But the basic point and the overall view is when one looks at

16   the entire life of this defendant, there just isn't this

17   behavior. And, again, I think that more than anything else and

18   the bizarre nature this crime led to the sense of the search

19   for some sort of mental health component that ultimately I

20   certainly rejected and note again.

21       And it reminds me of the employment history that he has.

22   None of that would be consistent, it seems to me, with this

23   severe type of mental illness that would have been required to

24   absolve the criminal responsibility. In any event, those are

25   the conditions that I've imposed. As I said, if there are

1     violations or problems on release, they can be addressed.

2         Mr. Yang, you're a young person.  You're going to spend a

3     lot of time in prison, as you know.  You've been there a while

4     already.  It already seems to have had some impact.  I urge you

5     to really consider carefully the impact upon your behavior, not

6     just on your family.  I can see from the letters, you've been a

7     good son, a good brother, a good -- you know, in many respects.

8     But your obligation as a human being doesn't just -- isn't

9     limited to your family.  It's to your fellow man, your fellow

10    -- you know, our fellow citizens.  We don't treat people,

11    nobody -- no civilized society can withstand or allow someone

12    to treat people like you treated these three women.  And that's

13    -- you can't undo that.  It would be nice if we could.  But you

14    can certainly, you know, consider it and make sure you guide

15    your future life by your desire to make amends.

16        And really you've noted you're -- the fact that you're a

17    father to a son.  The last thing would you ever want is your

18    son to make these kinds of mistakes.  You have lessons to

19    teach, but only if you -- if you make sure you build your own

20    life back and into the kind of life that your siblings suggest

21    and that I have no doubt others can be proud of.  But that is

22    really in your hands.  This sentence is not a death sentence.

23    It doesn't condemn you.  It condemns your behavior.  But you're

24    certainly capable of being far better than that day in October

25    of 2019.

1        So that's the sentence of the Court.  Other than appeal

2   rights, have I omitted anything?

3              MR. PHILLIP:  No, your Honor.

4              MR. MAIER:  No, your Honor.

5              THE COURT:  Okay.  Mr. Yang, you do have the right to

6   appeal your conviction or your sentence.  Your attorney will

7   talk to you about possible grounds to appeal.  If you cannot

8   afford the costs of an appeal, the clerk will assist you so you

9   can file in forma pauperis and not have to pay those costs.  If

10  you choose to appeal, you have to file a notice of appeal

11  within 14 days of the entry of the judgment.  If you fail to

12  file a timely notice of appeal, you would lose your right --

13  that right.  Do you understand those things?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Okay.  Then this matter is concluded.

16  Thank you all.

17             (At 2:32 p.m. the hearing ended.)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3                    I, JENNIFER L. STAKE, RDR, CRR, an Official

4    Court Reporter for the United States District Court for the

5    Eastern District of Wisconsin, do hereby certify that the

6    foregoing is a true and correct transcription of the audio file

7    provided in the aforementioned matter to the best of my skill

8    and ability.

9

10

11   Dated this 28th day of July, 2022.

12   Milwaukee, Wisconsin.

13

14

15                    Jennifer L. Stake, RDR, CRR
                 United States Official Court Reporter
16               517 East Wisconsin Avenue, Room 324
                         Milwaukee, WI   53202
17

18                 Jennifer_Stake@wied.uscourts.gov

19

20

21

22   ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
     Official Court Reporter, RDR, CRR
23   _____

24

25